UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 4:19 CR 494 |
| | ) | |
| Plaintiff | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| vs. | ) | |
| | ) | **MOTION TO SUPPRESS** |
| JUSTIN OLSEN | ) | |
| | ) | |
| Defendant | ) | |

Now comes the Defendant, JUSTIN OLSEN and pursuant to Fed. R. Crim. P. 12, requests an Order suppressing all evidence seized on or about August 7, 2019 as a result of the execution of a search warrant at XXX Oakridge Drive, by federal agents and the Boardman Police Department.

On or about August 7, 2019 various law enforcement agents and officers executed a search warrant at the Defendant's residence at XXX Oakridge Drive, Boardman, Ohio. The search warrant was issued based upon information obtained during an illegal "protective sweep" of the same residence by law enforcement officers. See *Grise v. Allen,* 2017 U.S. App. Lexis 21358 (6th Cir. Oct. 26, 2017), *U.S. v Gantt*, 2018 U.S. App. Lexis 7170 (6th Cir. Mar. 21, 2018). Accordingly, the subsequent search of XXX Oakridge Drive violated the prohibition against unreasonable searches and seizures as set forth in U.S. Const. amend. IV.

Because the affidavit at issue was based upon information that was obtained during an illegal "protective sweep", exclusion of the seized evidence is the appropriate remedy. *Wong Sun*

1

*v. United States*, 371 U.S. 471 (1963). The legal basis for this motion to suppress is more fully set forth in the Memorandum attached hereto, incorporated herein, and made part hereof.

        Respectfully submitted,

        /s/J. Gerald Ingram
        J. GERALD INGRAM (#0007887)
        INGRAM, CASSESE & GRIMM, LLP.
        7330 Market Street
        Youngstown, Ohio 44512
        330/758-2308 (phone) 330/758-8290 (fax)
        Attorney for Defendant, Justin Olsen

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of November 2019, a copy of the foregoing Motion to Suppress was electronically filed.  Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

        /s/J. Gerald Ingram
        J. GERALD INGRAM   (#0007887)

## STATEMENT OF FACTS

On or about August 6, 2019 Detective William Woods of the Boardman Police Department (hereafter "BPD") obtained an arrest warrant for the Defendant charging him with state Menacing charges. That same day, Detective Woods obtained a search warrant for the Defendant's Mother's address at XXX Presidential Court, Boardman, Ohio—the address at which he believed the Defendant resided.

On or about August 7, 2019 various federal agents and local law enforcement officers executed the search warrant at XXX Presidential Court. No weapons of any kind were located at XXX Presidential Court. The Defendant's Mother, Melanie Olsen, testified during the detention hearing that there were no guns in her home and that she would not allow guns to be in her home. (R. 16: Transcript, PageID#103).  While executing the search warrant at Melanie Olsen's home, the Boardman Police and FBI learned that Justin had moved to his Father's house, XXX Oakridge Drive, a couple of weeks earlier.  (Id. at Page ID#45).  Law enforcement agents then proceeded to the Oakridge Drive address and observed Justin exiting his Father's residence. Justin was placed under arrest without incident—he did not flee, resist or threaten the offices, and was otherwise polite and courteous during the entire exchange. (Id. at PageID#57).

The Defendant waived his *Miranda* Rights and agreed to talk to law enforcement officers. The Defendant gave law enforcement officers consent to search his car and his bedroom. There were no guns, weapons or hate literature located in the Defendant's bedroom at his father's house. There was a machete in the trunk of the motor vehicle the Defendant was driving.  Eric Olsen, the Defendant's father, testified that the machete was his and that he had used to it clear brush and left the machete in the trunk of the car which was eventually given to Justin. (Id. at PageID#93). There was no evidence that the machete was ever used as a weapon, threatened to be used as a weapon, or that any posts displayed or reference the machete as a weapon.

Upon entering Eric Olsen's residence, law enforcement officers observed boxes of ammunition sitting on the stairs. Officer observed a handgun in the living room or family room. (Id. at PageID#48,91). While the Defendant was in custody, Special Agent Tsarnas allowed the Defendant to call his Father, Eric Olsen. Eric Olsen expressly declined to give the officers' consent to search his residence. Despite this fact, the law enforcement agents proceeded to search the entirety of the house, including Eric Olsen's bedroom and closet. It should be noted that only Eric and Justin resided at XXX Oakridge Drive; and both the agents and officers were well aware that Eric Olsen was not at the residence at the time of the initial "protective sweep." During this purported "protective sweep," law enforcement officers observed ammunition, armored vests, and a gun safe in the closet of the bedroom of Eric Olsen.

There was a surveillance camera positioned on top of the gun safe that recorded a portion of the "protective sweep." During the recording, the law enforcement officials are joking and conversing about the amount of ammunition in Eric Olsen's bedroom, and discussing the need to obtain a search warrant. One such officer while looking into the closet where the gun safe is located, says "let's hit rewind" as he closes the closet door. The video further depicts various agents walking about Eric Olsen's bedroom—not a single officer or agent appears threatened, uneasy or in a state of concern. Their demeanor can only be characterized as lighthearted and jovial.

Eric Olsen then returned to his residence, and pursuant to the search warrant, opened the gun safe for law enforcement officers. (Id. at Page ID#49). Eric Olsen told law enforcement officers that all firearms, firearms paraphernalia and ammunition were his and that he was a competitive shooter. (Id. at PageID#32). Justin had told law enforcement officers that he did not have access to the gun safe and Justin's lack of access was confirmed by his father. (Id. at PageID#63). There was a surveillance camera positioned on top of the gun safe (Id. at PageID#64),

which was motion activated, and upon activation sent an alert to Eric Olsen's cell phone. Eric Olsen had never received an alert that his son was attempting to gain access to his gun safe. (Id. at PageID#88).

## LAW AND ARGUMENT

No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891). In addition, the IV Amendment of the U.S. Constitution protects people from unreasonable searches and seizures wherever an individual has a "reasonable expectation of privacy." See *Katz v. United States*, 389 U.S. 347.

There are exceptions, however, to the warrant requirement--once such exception is a "protective sweep." See *Chimel v. California*, 395 U.S. 752. A "protective sweep" is a quick and limited search of a premise, incident to arrest, and conducted to protect safety of police officers or others. An officer may conduct a protective sweep if there are articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing danger to those on the arrest scene. *Grise v. Allen*, 2017 U.S. App. Lexis 21358 (6th Cir. Oct. 26, 2017). A "protective sweep" must last no longer than is necessary to assure the officers' safety, complete the arrest, and depart the premises. *United States v. Akrawi*, 920 F.2d 418. 420 (6th Cir. 1990).

In *United States v. Archibald*, 589 F.3d 289, the Sixth Circuit Court of Appeals decided the scope of a "protective sweep" relative to an individual who was arrested in the threshold of his doorway. The Court in *Archibald* noted that:

> [t]he Supreme Court has identified two types of warrantless protective sweeps of a residence that are constitutionally permissible immediately following an arrest. The first type allows officers to "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Maryland v Buie,* 494 U.S. 325, at 334, 110 S.Ct. 1093. The second type of sweep goes "beyond" immediately adjoining areas but is confined to "such a protective sweep, aimed at protecting the arresting officers[.]" *Id.* at 334–35, 110 S.Ct. 1093. The first type of sweep requires no probable cause or reasonable suspicion, while the second requires "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 334, 110 S.Ct. 1093. The Supreme Court also "emphasize[d]" that this second kind of sweep is "not a full search of the premises," but "extend[s] only to a cursory inspection of those spaces where a person may be found" and should last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335–36, 110 S.Ct. 1093. *Id*. at 295.

The Sixth Circuit in *Archibald* ruled that the police officers' warrantless sweep search of the defendant's residence, following the defendant's arrest, was not justified under the Fourth Amendment as a search of the area immediately adjoining the place of arrest from which an attack could immediately be launched. *Id*. at 301. The court further noted that even if an officer stepped into the threshold of the door of the residence to initiate the arrest by grabbing the defendant and pulling him outside, the arrest was completed outside the residence, where the defendant was handcuffed and patted down. The officers swept not just the room immediately adjoining the doorway, but also the kitchen and upstairs bedroom of the residence. The Sixth Circuit ultimately held that the government failed to meet its burden of demonstrating "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Archibald*, at 301 citing *Buie*, 494 U.S. at 334.

The instant case deals with the second type of "protective sweep" described in *Buie*. In order for the "protective sweep" in the instant case to pass constitutional scrutiny, the government must be able to articulate facts that would warrant a reasonably prudent officer to believe that the

6

area to be swept harbored an individual posing a danger to those on the scene. *Id*. Upon arrival at XXX Oakridge Drive, the Defendant was observed outside of the residence. The Defendant was immediately taken into custody and placed under arrest while still outside of the residence. The Defendant was then *Mirandized* and provided the officers and agents with consent to search only his vehicle and bedroom. The only other person that resided at XXX Oakridge Drive is Eric Olsen. Law enforcement officers knew that Eric Olsen was not inside the residence and had no reason to believe that any other person was inside.

Upon entering the residence, with consent to search only the Defendant's bedroom, Detective Woods claimed that officers "observed approximately 300 rounds of various ammunition to include rifle ammunition on the stairway leading to the second floor." *See* Tsarnas Affidavit, attached hereto as Exhibit A. After searching the Defendant's bedroom, and not finding any firearms, ammunition, or weapons—the law enforcement officials then conducted a "safety sweep " of the entire residence. Eric Olsen had expressly declined to give consent to search his residence. Despite having one of the two occupants of the home in custody, knowing that the other occupant was not home, and not having consent to search the home, the officers conducted a "safety sweep" of the residence. Both Special Agent Tsarnas and Detective William Woods claim in their affidavits, using precisely the exact same language, that, "Given the nature of the threat, the potential for firearms in the house and the potential of suspects unknown being inside the residence, officers conducted a safety sweep of the residence."

During this purported "safety sweep," law enforcement officers observed a significant amount of ammunition and a large gun vault in the close in Eric Olsen's bedroom. Upon opening the door to the closet, the surveillance camera positioned on top of the safe recorded a portion of the "protective sweep." The video depicts at least four (4) law enforcement officers in Eric Olsen's bedroom. It is apparent that they there were in his bedroom for a significant period of time. Further,

after realizing that they were being recorded, one of the law enforcement officials then manipulates the camera rendering it inoperable. Not a single officer depicted in the video appears to be fearful for their wellbeing—the stark reality is much to the contrary. The officers are chitchatting with one and other about what they discovered and can be heard laughing and making jokes as they illegally search Eric Olsen's room. One of the officers coyly opens the door to closet where the gun safe is located and says "let's hit rewind" as he shuts the door smiling. The officer's statement appears to allude to the fact that he knows that he should not be searching Eric Olsen's bedroom. After the purported "safety sweep," Eric Olsen returned to his residence and upon presentment of the search warrant, opened the gun safe for the agents and officers. Eric informed all of the law enforcement officers that he was a competitive marksman, and that all of the firearms, firearms paraphernalia and ammunition belonged to him. (R. 16: Transcript, PageID#52). Justin had already told law enforcement officers that he did not have access to the gun safe, and Justin's lack of access was confirmed by his Father. (Id. at PageID#63). The surveillance camera on the top of the gun safe automatically sent an alert to Eric Olsen's cell phone if it detected any motion—Eric Olsen never received an alert that Justin was attempting to gain access to the safe. (Id. at PageID#88).

  The government will be unable to meet the "protective sweep" test as set forth in *Buie*. Based upon the facts and applicable law, there are no articulable facts that the government can present that would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene. *Archibald* at 301. As a result of evidence improperly viewed during the illegal protective sweep, law enforcement officers obtained a search warrant for the Oakridge Drive property.

  The exclusionary rule "prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of primary evidence or that is otherwise acquired as an indirect

result of the unlawful search up to the point at which the unlawful search becomes so 'attenuated as to dissipate the taint.'" *Murray v. U.S.*, 487, U.S. 383, 537, 108 S.Ct. 2529 (1988) quoting *Nardone v. United States*, 308 U.S. 338, 60 S. Ct. 266 (1939). Evidence obtained in an an unlawful protective sweep that officers then rely upon in deciding to seek a warrant is grounds for exclusion of evidence obtained pursuant to the subsequent search warrant. See e.g. *U.S. v. Siciliano*, 578 F.3d 61, (1st Cir. 2009). As such, the search warrant issued for XXX Oakridge Drive was based upon information obtained during an illegal "protective sweep," and all evidence seized as result of the search warrant must be suppressed.

## CONCLUSION

An officer may conduct a protective sweep if there are articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing danger to those on the arrest scene. *Grise v. Allen*, 2017 U.S. App. Lexis 21358 (6th Cir. Oct. 26, 2017). During the alleged "protective sweep" the Defendant was in custody, and the law enforcement officers were fully aware that Eric Olsen was not home—the "protective sweep" is simply not supported by the facts or relevant law. Accordingly, the subsequent search of XXX Oakridge Drive violated the prohibition against unreasonable searches and seizures as set forth in U.S. Const. amend. IV.

Defendant prays for an evidentiary hearing and for the opportunity to further brief this matter once the evidence and testimony has been received. The Defendant moves that the Court state its essential findings of fact and conclusions of law pursuant to Fed. R. Crim. Pro. 12 (F). The search in question violated the Fourth Amendment's prohibition against unreasonable search and seizures. WHEREFORE, Defendant moves this court for an order suppressing any and all evidence that was unconstitutionally obtained from the residence located at XXX Oakridge Drive.

Respectfully submitted,

/s/J. Gerald Ingram
J. GERALD INGRAM (#0007887)